IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § | |
| Plaintiff, § § | |
| v. § § | Case No.: 4:23-cv-00905 |
| BRADY JACK SPEERS, CHATREE THIRANON, and GHAP, LLC d/b/a BLUE STAR TEXAS, § § § § | |
| Defendants. § § § | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "Plaintiff") files this Complaint against Defendants Brady Jack Speers ("Speers"), Chatree "Ben" Thiranon ("Thiranon"), and GHAP, LLC d/b/a Blue Star Texas ("Blue Star") (collectively, "Defendants"), and alleges as follows:

## I.
## SUMMARY

1. From at least April 2017 through December 2022 (the "Relevant Period"), Defendants raised approximately $8 million from 40 investors in unregistered securities offerings in a residential house-flipping scheme by means of a series of misrepresentations and omissions. Defendants claimed, among other things, that investor funds would be used to purchase, renovate, market, and sell residential properties. Defendants further promised investors that they would earn profits through promissory notes featuring high monthly or annual interest rates, while also promising the prompt return of investors' principal.

2. Unfortunately, Defendants misrepresented and omitted key material information concerning the use of investor funds, Blue Star's ownership (or lack thereof) in certain properties,

1

the security of investors' principal, and Speers's prior securities law violations and multiple personal bankruptcies.  First, while Defendants assured investors that their funds would be used for real estate investments, Defendants actually used more than $2.9 million of the $8 million in investor funds on personal expenses, cash withdrawals, and wire transfers to personal bank accounts.  Defendants also used approximately 16% of investor funds to make Ponzi-like investment distributions by using funds from newer investors to pay earlier investors.  Second, Defendants misrepresented that investor funds would be applied or allocated to specific, discrete projects.  In truth, Defendants rolled over investor funds to new projects without investor authorization.  Third, Defendants claimed that investor funds were secured by property interests in the specific real estate assets underlying the investments.  Contrary to those representations, Defendants only secured investor interests in isolated instances involving particularly large investors, and in several cases Defendants themselves never even held title to the properties that would give rise to a secured interest.  Finally, Defendants failed to disclose Speers's prior violations of the federal securities laws and multiple personal bankruptcies.

3.      Through their actions, Defendants violated, and unless enjoined will continue to violate, the federal securities laws.  Specifically, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Additionally, Defendants violated the securities-registration provisions of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

4.      To protect the public from further fraudulent activity, the Commission brings this action against Defendants and seeks: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains from Defendants, plus prejudgment interest; (iii) civil penalties; (iv) the appointment of a

liquidation agent; and (v) such other and further relief as the Commission may show itself entitled.

## II.
## JURISDICTION AND VENUE

5. The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin Defendants from engaging in the acts and practices alleged herein.

6. The Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7. Venue is proper, because the Fort Worth Division of the Northern District of Texas is where: (1) Blue Star maintained its principal place of business [Mansfield, Texas] during the Relevant Period; (2) Speers and Thiranon reside; and (3) a substantial part of the acts, omissions, transactions, practices, and courses of business giving rise to the claims occurred.

8. Defendants, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the acts, omissions, transactions, practices, and courses of business described in this complaint.

## III.
## DEFENDANTS

9. Blue Star is a Delaware limited liability company, originally established in Nevada in January 2016. Blue Star maintains its principal place of business at 8 Pinnacle Court, Mansfield, Texas 76063, which is also Speers's residence. Blue Star is managed by Speers and Thiranon. Blue Star purports to buy, renovate, and sell houses. Neither Blue Star nor its securities are registered with the Commission.

10. Speers, age 53, resides in Mansfield, Texas. He is a Co-Manager of Blue Star. In June 2016, this Court issued a final judgment against Speers for various violations of the antifraud

and registration provisions of the federal securities laws in connection with his fraudulent offer and sale of life settlement interests. *See SEC v. Christopher Novinger, et al.*, Case No. 4:15-cv-00358-O (N.D. Tex.). The final judgment in that case ordered, *inter alia*, Speers to pay over $500,000 in disgorgement and civil penalties. In 2003, Speers filed for bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code [11 U.S.C. §§ 701, *et seq.*]. *See In re: Brady J. Speers*, Case No. 4:03-bkr-43754 (N.D. Tex. Bankr.). In 2016, Speers again filed for bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code [11 U.S.C. §§ 701, *et seq.*]. *See In re: Brady J. Speers*, Case No. 4:16-bk-40317 (N.D. Tex. Bankr.).

11. Thiranon, age 47, resides in Fort Worth, Texas. He is a Co-Manager of Blue Star.

## IV.
## STATEMENT OF FACTS

**A. Background.**

12. In early 2016, Speers registered Blue Star in Nevada, listing his wife as the sole manager. Thiranon, who worked with Speers in prior business ventures, joined Blue Star shortly after its formation in 2016. From the outset, Speers's plan for Blue Star was to serve as a house-flipping enterprise, purchasing residential properties at a discount, renovating them, and selling them for a profit.

13. Speers and Thiranon have controlled all aspects of Blue Star's business. They identified and selected properties to purchase, determined renovation budgets, chose contractors to perform renovation work, and decided the listing agent and sales price for each property. Together, they also secured Blue Star's funding through individual investors and third-party financing. Both Speers and Thiranon solicited potential investors and executed investor agreements on behalf of Blue Star.

14. In April 2017, Speers began raising funds from investors. Under the Blue Star

name, Speers initially approached clients from his former annuity sales business, and grew his investor base after several client referrals. Defendants created and used marketing materials that touted the benefits of investing with Blue Star, including the turnkey nature of the projects. They also touted Speers's success as a businessman. Speers and Thiranon solicited investors through interstate means, including telephone calls, text messages, emails, public Facebook and YouTube sites, and promotion of their house-flipping activities through a podcast called Flip Squad.

15. Blue Star purports to have flipped approximately 40 houses since its inception.

**B.    Blue Star Investment Vehicles**

16. Throughout the Relevant Period, Defendants used multiple investment methods to lure investors to fund Blue Star's house-flipping activities.

*1.    Blue Star's General Promissory Notes*

17. Blue Star initially raised funds for the business generally as opposed to raising funds for particular house projects. Defendants drafted, and issued to investors, promissory notes with one-year to four-year terms and interest rates ranging from 8% to 27.5% ("General Notes"). The General Notes included a "use of funds" section, which detailed a variety of activities common to real estate. The General Notes further provided that Blue Star and the investor were required to execute a separate extension of the note if Blue Star wanted to use the investor's funds after the note matured.

*2.    Blue Star's Property-specific Promissory Notes*

18. In mid-2019, Blue Star began offering and selling property-specific investments, known internally as "gap funding" promissory notes ("Property-Specific Notes"). These Property-Specific Notes were tied to specific properties, as opposed to the General Notes which applied generally in Blue Star's real estate business. In addition, for each Property-Specific Note, Blue Star and its investors executed a Joint Property Partnership Agreement ("JPPA"). The JPPA

identified the property and the specific use of investor funds, and purported to provide the investor with a security interest in the respective property. According to the Property-Specific Note, Blue Star would return an investor's funds (principal and any unpaid interest) after the closing of the sale of the subject property, unless both parties agreed to "rollover" the funds into a new Blue Star project.

**C.   Defendants Misled Investors**

19.   Defendants used various material misrepresentations and omissions to persuade investors to invest with Blue Star.

### *1.   Defendants Misappropriated Investor Funds*

20.   Though the terms in the General Notes, Property-Specific Notes, and JPPAs changed over time, these investment agreements commonly included language specifying how investor funds would be used, including:

> (a)   "Lender acknowledges that Borrower will purpose the funds from the loan or various aspects of the growth of the Real Estate transactions of [Blue Star] including but not limited to the purchase of properties, rehab and upgrade costs such as general construction, roofing, appliances, flooring, etc., and/or operational costs, general materials, contract work, marketing and advertising, staff expansion and payroll if necessary, remodeling, new construction if required, property expansions and other goods or services the Borrower deems as necessary for the expansion of the company."
>
> (b)   "Borrower/Developer intends to purpose the [investor] funds from the Note for specific purposes of the Real Estate transactions of [Blue Star] including but not limited to material pre-ordering, down-payments, earnest money deposits, option money, construction initiation, demo work, property

        insurance policy acquisition, permits, architectural and engineering drawings, reimbursements and other goods or services the Borrower/Developer deems as necessary for the initial phases of project initiation."

    (c)    "Developer will purchase, repair, improve, maintain The Property…"

    (d)    "The Funding Partner will provide [amount]…which are a portion of the total funds needed to purchase, repair, improve, maintain, and sell The Property."

The promissory notes and JPPAs, however, lacked any reference to compensation or management fees to be paid to Blue Star, Speers, or Thiranon.

    21.    Although Blue Star purchased, renovated, and, in most cases, sold properties as promised, Speers and Thiranon also misappropriated at least $2.9 million dollars of commingled investor funds (approximately 36% of the total amount raised from investors) for their personal use. Defendants' misappropriation of investor funds for personal use also affected Blue Star's ability to return funds to investors. For example, many investors repeatedly requested the return of their funds, but Speers or Thiranon told them that the funds were tied up in *other* properties. As a result, Blue Star could neither make the promised interest payments on the notes nor repay investors' principal, due in large part to Defendants' misuse of investor funds.

    22.    Speers and Thiranon did not maintain a bank account per property or type of investment, but rather commingled and transferred investor funds across multiple Blue Star bank accounts. These accounts were controlled by both Speers and Thiranon along with Speers's wife, who was an authorized signatory. Defendants commingled investor funds with other pools of funds such as title company proceeds from property sales and third-party lender funds that were

supposed to be used to renovate the properties. In addition to property acquisition and renovation as well as other business expenses, Speers and Thiranon spent commingled investor funds on personal expenses (36% of investor funds raised). The following chart summarizes how Defendants misused investor funds:

| Expense | Amount |
|---|---|
| Payments and Transfers to Speers, Thiranon, Related Persons and Entities (excludes salary) | $856,006 |
| Withdrawals | $619,220 |
| Miscellaneous Personal Expenses | $476,011 |
| Personal Credit Card/Loan Payments | $402,237 |
| Retail Shopping | $195,517 |
| Purchases/Payments through Payment Platforms (Cash App, PayPal, etc.) | $108,335 |
| Personal Mortgage Payments | $99,074 |
| Meals and Groceries | $88,654 |
| Entertainment | $40,215 |
| Student Loan Payments | $23,077 |
| Personal Travel Expenses | $13,679 |
| Total | $2,922,025 |

### 2. *Defendants Made Ponzi-like Payments to Investors*

23.     Defendants also used commingled investor funds to make Ponzi-like payments to earlier and/or other investors. In total, during the Relevant Period, Blue Star distributed approximately $3 million back to investors in principal and interest payments. Of this amount, Blue star used approximately $1.3 million (or 16% of the funds raised) to make Ponzi-like payments or pay "returns" to other investors. Additionally, an analysis of Defendants' bank records reveals that distributions made to investors in 2021 and 2022 exceeded the proceeds that Blue Star received from title companies by $183,482 and $322,836, respectively. Consequently, Blue Star could not have funded the total amount of investor payments solely from the profits

generated by property sales. In fact, in multiple instances, Blue Star used new investor funds (or new funds from existing investors) to immediately pay principal and interest to other investors. The following three examples illustrate Defendants' use of commingled funds to make Ponzi-like payments to certain investors.

      a.    *Ponzi-like Payment Example No. 1*

24. On August 21, 2020, Blue Star bank account ending 6552 had an opening account balance of $4,250.26. Investor funds from two investors totaling $105,000 were transferred from Blue Star bank account ending in 6609 to account ending 6552 between August 21 and August 24, 2020. On August 24, 2020, $75,000 was paid to a different investor for a partial return of principal. But for Defendants' transfer of new investor funds to Blue Star bank account ending 6552, Defendants would not have had the funds to pay the return of principal to the early investor.

      b.    *Ponzi-like Payment Example No. 2*

25. On February 7, 2022, Blue Star bank account ending 6609 had an opening account balance of $386.01. On February 7, 2022, a total of $374,000 was wired to this account from three different investors and $9,500 was transferred to this account from Blue Star account ending 6552. There were no other deposits into account ending 6609 until February 18, 2022. Nonetheless, from February 7, 2022 to February 14, 2022, a total of $152,683.33 was distributed to eight other investors, including three principal payments to two of the investors. But for Defendants' transfer of new investor funds to Blue Star bank account ending 6609, Defendants would not have had the funds to pay the distributions to the eight earlier investors.

      c.    *Ponzi-like Payment Example No. 3*

26. On December 15, 2022, Blue Star bank account ending 6609 had a *negative* opening account balance of $263.70. That day, $230,000 in investor funds was wired to this account from one investor and $2,000 was deposited from an investor's brokerage account. From

December 15 to December 29, 2022, a total of $105,857.73 was distributed to 23 other investors, including at least one principal payment of $40,000. In addition, there was $47,000 transferred to Blue Star account ending 6552 and $21,000 transferred to Blue Star account ending 6560. But for Defendants' transfer of new investor funds to Blue Star bank accounts ending 6552, 6560, and 6609, Defendants would not have had the funds to pay the distributions to the earlier 23 investors.

### 3. *Defendants Unilaterally Rolled Over Investor Funds to New Investment Offerings Without Obtaining Investor Authorization*

27. Blue Star "rolled over" at least eight investments to new properties without obtaining investor authorization, much less notifying investors of this change. Each Property-Specific Note stated that an investor's principal and any outstanding interest were payable in a lump sum within a certain number of days after the closing of the sale of the subject property (typically five to ten business days). However, Blue Star frequently ran low on funds, driven in part by Speers's and Thiranon's excessive personal spending. Rather than seeking the investors' consent to roll over the needed funds, as required by the Property-Specific Notes, Blue Star unilaterally transferred certain investor funds to new projects. In fact, some investors only learned that Blue Star had sold the underlying property when they saw Defendants' posts on Facebook.

28. For investments through General Notes, Blue Star retained investor funds for at least two investors beyond the promissory note's maturity date without authorization. As with funds that had been rolled over, these extensions happened only on paper; no funds were moved into different bank accounts or were otherwise handled separately. When contacted by investors in non-property specific investments, Speers and Thiranon told investors that they (and Blue Star) rolled over their funds into a new project, or extended their funding agreements, to "keep their money working."

### 4. *False Statements Regarding Ownership and Security Interests in the Properties*

29. Defendants misrepresented the ownership status of, and the investors' security interest in, certain Blue Star properties. Most JPPAs stated:

> Except as otherwise provided herein, [Blue Star] and/or [a lender] will hold primary deed of title to The Property and [investor] will hold second deed of title. The Property shall remain in Developer's name and will maintain The Property free from liens and other encumbrances beyond the normal course of business.

However, contrary to Defendants' representations, Blue Star had no ownership interest in at least eight properties, and the investors had no security interest. An unaffiliated third-party actually owned the properties.

#### a. *Blue Star Did Not Own Certain Investment Properties*

30. On more than one occasion, Blue Star partnered with a certain joint venturer ("Joint Venturer") and an assortment of her personal companies. The Joint Venturer purchased properties and executed agreements with Blue Star to provide the labor needed to rehab the properties for sale. The Joint Venturer exercised a significant amount of control over these joint ventures, selecting and interacting with subcontractors and real estate agents connected with the properties. However, Blue Star also solicited investments for these Joint-Venturer-owned properties from other investors. Notably, Defendants claimed that Blue Star owned these properties, even though they were actually owned by the Joint Venturer. Moreover, investors other than the Joint Venturer were unable to exert any control or make any decisions regarding any of the subject properties. In all respects, they were passive investors who relied on Blue Star to generate profits for them.

31. Investors in these properties were not aware of the Joint Venturer's ownership, or the risk that her ownership of the properties presented to their investments with Blue Star. In one instance, the Joint Venturer chose to keep a property for her own personal use, rather than allowing Blue Star to renovate and sell it according to the terms of their joint venture agreement for the

11

property. When this occurred, Defendants simply rolled over investor funds earmarked for this property into another project without investors' approvals.

          b.     *<u>Investors Had No Security Interest</u>*

32. Defendants also misrepresented the status of the secured interests for investors that invested in particular properties. The promissory notes and JPPAs stated that the investments were secured through a deed of trust on the subject property. However, this representation was false. County property records reflect that, of the 40 properties Blue Star offered as investments to investors, liens existed on only three properties. These liens were recorded only for three investors who all happened to have relatively large investments. Thus, contrary to Defendants' representations, most investors never held a secured interest in any property.

    **5.**    ***Defendants Concealed Speers's Checkered Past***

33. Defendants touted Speers's success as a businessman to potential investors through emails and Blue Star's business plan. In the Blue Star Business plan, Defendants stated:

> The Blue Star Texas team has 15 years of business management and financial services related experience and over 25 years of combined corporate management experience, both of which will contribute to the long-term success of Blue Star Texas.

34. On June 2, 2017, Speers also emailed at least one investor summarizing his business experience and background:

> At one point in 2005 I had a healthcare business that had 60 employees and did about $5m a year in revenue. But I was young and made poor decisions and didn't have the smarts to see the writing on the wall to shut it down and take my earnings before the market slowed and I ended up spending that money trying to chase my losses. Lesson learned.

35. Defendants notably failed to disclose the final judgment that this Court entered against Speers in connection with an SEC lawsuit related to a prior business, as well as two personal bankruptcy filings. Specifically, Speers omitted material information including:

    (a)    Speers filed for Chapter 7 bankruptcy in April 2003. *See In re: Brady J. Speers*, Case No. 4:03-bkr-43754 (N.D. Tex. Bankr.)

    (b)    The SEC charged Speers in 2015 with various violations of the anti-fraud and registration sections of the federal securities laws. *See SEC v. Christopher Novinger, et al.*, Case No. 4:15-cv-00358-O (N.D. Tex.). In June 2016, this Court entered final judgments against, *inter alia*, Speers, a Speers-owned entity (Speers Financial), and a jointly owned entity (Novers Financial). In these final judgments, this Court ordered, *inter alia*, that Speers pay disgorgement and prejudgment interest of more than $375,000, and a civil penalty of $150,000.

    (c)    Speers filed for Chapter 7 bankruptcy in January 2016. *See In re: Brady J. Speers*, Case No. 4:16-bk-40317 (N.D. Tex. Bankr.)

36. In considering whether to invest in Blue Star and in evaluating Speers' acumen as a businessman, reasonable investors would have wanted to know about the final judgment entered against Speers in a previous (and recent) SEC action, as well as his personal bankruptcies.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of a Security**

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]**

*Against All Defendants*

37. Plaintiff re-alleges and incorporates paragraphs 1 through 36 of this Complaint by reference as if set forth verbatim in this Claim.

38. By engaging in the acts and conduct alleged herein, Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security,

by the use of any means or instrumentality of interstate commerce, or of the mails, knowingly or with severe recklessness:

    (a)    employed a device, scheme, or artifice to defraud; and/or

    (b)    made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

39. By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b].

## SECOND CLAIM FOR RELIEF

**Fraud in the Offer or Sale of a Security**

**Violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)]**

*Against All Defendants*

40. Plaintiff re-alleges and incorporates paragraphs 1 through 36 of this Complaint by reference as if set forth verbatim in this Claim.

41. By engaging in the acts and conduct alleged herein, Defendants directly or indirectly, singly or in concert with others, in the offer or sale of a security, by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, have:

    (a)    knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

    (b)    knowingly (or with severe recklessness), recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    knowingly (or with severe recklessness), recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

42.    By reason of the foregoing, Defendants have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Securities-Registration Violations**

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) & (c)]**

*Against All Defendants*

43.    Plaintiff re-alleges and incorporates paragraphs 1 through 36 of this Complaint by reference as if set forth verbatim in this Claim.

44.    By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly:

    (a)    made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or

    (b)    for the purpose of sale or delivery after sale, carried or caused to be

        carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; and/or

(c)      made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement had been filed.

45.      There were no applicable exemptions from registration.

46.      By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1.      Permanently enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2.      Permanently enjoining Speers and Thiranon from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent them from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

3.      Permanently enjoining Speers and Thiranon from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

    4.    Ordering Defendants to disgorge all ill-gotten gains received as a result of the violations alleged herein, plus prejudgment interest thereon, pursuant to the Court's equitable powers and Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)];

    5.    Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

    6.    Ordering the appointment of a liquidation agent to sell real property under the jurisdiction of the Court; and

    7.    Imposing such other and further relief as the Commission may show itself entitled.

Dated: August 31, 2023

Respectfully submitted,

*s/Jason P. Reinsch*
Jason P. Reinsch
Texas Bar No. 24040120
Jeaneen Kappell
Texas Bar No. 24069656
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2601 (phone)
(817) 978-4927 (facsimile)
ReinschJ@SEC.gov
Kappellj@sec.gov

ATTORNEYS FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION